***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence (with the exception of the Stipulation on plaintiff's average weekly wage referenced above); rehear the parties or their representatives; or amend the Opinion and Award, except for the modifications contained herein. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Donovan with the modifications contained herein.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. Plaintiff was employed as a field technician (Field Tech) with defendant-employer.
3. Per stipulation of the parties entered into after leave of the Full Commission, plaintiff's average weekly wage was $485.00 per week which yields a compensation rate of $323.35.
4. Key Risk Management is the carrier on the risk for defendant-employer. *Page 3 
5. The issues for determination are:
 a. Whether the occupational disease claimed by plaintiff is causally related to his 11 plus years of employment as Field Tech for defendant-employer?
 b. Whether plaintiff is permanently and totally disabled from employment?
 c. To what, if any, benefits is plaintiff entitled?
 *********** EXHIBITS
1. The parties stipulate the following documentary evidence:
 a. Stipulated Exhibit #1: I.C. Forms
 b. Stipulated Exhibit #2: Current medical records
 c. Stipulated Exhibit #3: Plaintiff's discovery responses
 d. Stipulated Exhibit #4: Prior medical records
 e. Stipulated Exhibit #5: Plaintiff's personnel file (including the Form 22 submitted by defendants)
 f. Stipulated Exhibit #6: A packet of 11 CD discs containing plaintiff's work orders for the years 1996 through 2006 submitted subsequent to the June 13, 2007 hearing.
 *********** RULING ON MOTION TO EXCLUDE DISPUTED MEDICAL RECORDS
The parties in this matter agreed to admit plaintiff's current medical records into evidence as Stipulated Exhibit #2. Defendants, however, refused to stipulate to the admission of correspondence from Dr. Armistead to plaintiff's counsel dated February 20, 2006 and August 21, 2006 (pages 9-11 of Stipulated Exhibit #2). These letters contain responses to specific *Page 4 
questions posed by plaintiff's counsel to Dr. Armistead regarding causation in this case and to which defendants, due to Dr. Armistead's untimely death, were denied the opportunity to undertake cross-examination of Dr. Armistead. At the hearing of this matter, the Deputy Commissioner was presented with a packet of stipulated records, which mistakenly included pages 9-11 of Stipulated Exhibit #2. On July 19, 2007, defendants moved that pages 9-11 of Stipulated Exhibit #2 be excluded from the packet of stipulated records and not be considered as evidence in this matter. The Deputy Commissioner allowed the motion to exclude pages 9-11 of Stipulated Exhibit #2 and did not consider them as evidence in this matter or as part of Dr. Armistead's medical records.
However, the Deputy Commissioner noted that the same two letters were introduced at the deposition of Dr. Ed Cooper as plaintiff's Exhibits #7 and #8, without objection by defendants. Dr. Cooper was asked whether he relied on any part upon the letters in reaching his conclusions to which he responded that he had. Defendants had an opportunity to cross-examine Dr. Cooper regarding this reliance. Accordingly, the Deputy Commissioner allowed the letters into evidence as deposition exhibits and admitted them for the purpose of showing how Dr. Cooper reached his medical conclusions in this case. The Full Commission agrees with this ruling for the most part. However, these letters are further allowed into evidence for the purpose of corroborating Dr. Cooper's testimony with respect to the causation of plaintiff's condition and whether or not plaintiff was exposed to an increased risk of developing the conditions which are the subject of this hearing.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission enters the following: *Page 5 
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 57 years old. Plaintiff was employed by defendant-employer as a Field Tech from August 19, 1996 through March 10, 2006.
2. Plaintiff's duties as a Field Tech included checking the sewer lagoon level and chlorine levels for an hour each morning, riding the line, putting up inventory, locating sewer lines and for the majority of time, responding to residential Work Orders for various septic problems.
3. The parties agree that upon receiving a work order, plaintiff would travel to the residential site and attempt to solve the problem. Plaintiff would first check the control panel on the house. At times the problem could be fixed at the control panel without accessing the sewer tank. If the problem could not be fixed at the control panel, the next step would be to open the green lid at the sewer tank by removing the bolts with a socket and ratchet. Once the lid was open, the next step was to make sure that the wires in the junction box were properly connected. The junction box was located approximately 18 inches below ground level and plaintiff often had to lie on his stomach to reach it, extending his arms into the sewer pit to perform the necessary work. If there was a fault or broken wire, plaintiff would fix it with stripping and a wire nut using a wire stripper and pliers. If the problem remained unresolved, plaintiff would have to remove the pump from the ground and repair or replace it. The pumps weighed approximately 100 pounds. Plaintiff worked alone approximately 70% of the time.
4. Plaintiff testified that it took between an hour and an hour and 15 minutes to repair a sump pump. He further testified that he serviced approximately two to three pumps per day. Plaintiff maintained that he spent two to *Page 6 
three hours per day using a wire stripper, two to three hours per day using wrenches, one and one-half hours per day using a hand saw and 30 minutes per day using a sledge hammer. In addition to these duties, plaintiff was also required to use a steel probe to locate sewage lines by sticking the probe down into the ground. Not included in plaintiff's time estimates were travel time to and from job sites, time to figure out the specific problem or time to accomplish any duties he had at the home plant.
5. James Krauss, plaintiff's supervisor, testified in great contrast to plaintiff regarding time estimates of job duties. Mr. Krauss stated that sump pumps were pulled an average of two to three times per week rather than per day, and those duties were split between three Field Techs. Mr. Krauss further stated that to repair a pump took between 30 and 40 minutes from start to finish.
6. David Eric Harper, a Field Tech for defendant-employer for 7.5 years, and plaintiff's co-worker for five of those years, also disagreed with plaintiff's portrayal of the job duties. Mr. Harper testified instead that a Field Tech would repair, on average, 1-2 pumps per week and would not repair pumps daily. Mr. Harper testified that on the days that a Field Tech would repair a pump, the Tech would use pliers for a total of about five to ten minutes. A Field Tech may use a wrench more often, but only on the days where actual repairs were being made to a pump, which was not daily and not for extended periods. Mr. Harper further added that a Field Tech only uses a sledgehammer, "very, very seldom" and a chisel rarely to never. He explicitly disagreed with plaintiff's assertion that he twisted wires two to three hours per day, stating that a Field Tech could twist a wire in about 20 seconds. Even fixing multiple wires at multiple sites would not require wire twisting of more than a few minutes a day.
7. While plaintiff's co-workers offered testimony regarding their opinion of how often and in what duration plaintiff performed his job duties, it is noted that they did not actually *Page 7 
accompany plaintiff on a majority of his work runs. In fact, Mr. Harper's main duties involved his staying at the spray field where he was occupied nearly full time. Mr. Harper went so far as to state that he did not have enough people to tend to the spray field as it is now. The plaintiff's testimony regarding his job duties in general was accurate and while the frequency and duration of job duties may have been a bit exaggerated, it is found to be generally credible.
8. In contrast, defendants maintain that the best evidence regarding plaintiff's job duties are the work orders submitted as Stipulated Exhibit #6. An examination of these documents reveals that they are, at best, unreliable. Evidence presented at the hearing shows that the work orders were not regularly or accurately filled out or recorded by defendant-employer. If the work orders are to be believed, on many days plaintiff did nothing more than a few minutes of work and entire weeks would go by without plaintiff accomplishing any tasks at all. It is evident that the work orders are not inclusive, complete or accurate in their description of plaintiff's activities, but rather offer a spot check at best.
9. The Full Commission finds as fact that plaintiff's description of the duties involved in his job are accurate and generally uncontroverted. The frequency in which these jobs were accomplished lies somewhere between the allegations of the parties, but are more credibly as that described by the plaintiff.
10. On July 25, 2005 plaintiff presented to Dr. Raymond Armistead at Carolina Orthopedic Associates, and was diagnosed with left upper extremity peripheral neuropathy. On August 1, 2005, Dr. Armistead diagnosed plaintiff with ulnar neuropathy of the left elbow and carpal tunnel syndrome.
11. On August 26, 2005, plaintiff underwent a left carpal tunnel release and a left elbow ulnar transfer performed by Dr. Armistead. He was written out of work following *Page 8 
surgery.
12. As of January 1, 2006, Dr. Armistead released plaintiff to return to work with a 25 pound lifting restriction. On January 12, 2006, he reduced the restriction to no left arm work at all "for the next couple of weeks."
13. On February 24, 2006, Dr. Armistead opined that plaintiff could return to light duty the next week. However, it does not appear that defendant-employer could accommodate plaintiff. On March 10, 2006, Dr. Armistead released plaintiff to return to work full-duty as of March 13, 2006. When plaintiff attempted to return to work in March, 2006, he was informed that he had been terminated from employment on March 10, 2006 under defendant-employer's policy that an employee who is unable to return to full duty within 12 weeks can be terminated.
14. On March 15, 2006, plaintiff filed a Form 18, alleging that his wrist and elbow conditions were work related.
15. Dr. Armistead was killed in a plane crash in December, 2006, and his office notes offer no opinion regarding the causal connection between plaintiff's condition and his work for defendant-employer.
16. On April 12, 2007, plaintiff underwent an Independent Medical Evaluation with orthopedic surgeon, Dr. Edwin Cooper. Dr. Cooper reviewed Dr. Armistead's notes and records, including the nerve conduction studies performed at Dr. Armistead's request, and examined plaintiff. Dr. Cooper concluded that plaintiff suffered from both bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome, also known as ulnar nerve palsy, which is an entrapment of the ulnar nerve at the elbow. He opined that plaintiff was at maximum medical improvement and had sustained nerve damage that resulted in a permanent partial disability rating of 41% to the right upper extremity and 36% to the left upper extremity. *Page 9 
17. Dr. Cooper opined that the 11 years during which plaintiff performed his job was sufficient to result in the development of scar tissue that caused his carpal tunnel syndrome. He further opined that even if plaintiff did not perform repetitive motion tasks in the amount that was described, it was the years of repeated performance coupled with the amount of force and weight, as well as being in awkward positions that plaintiff had to assume while using his hands and arms, rather than the repetitive aspect of the motions alone that caused plaintiff's condition. When asked whether his opinion would change with knowledge that plaintiff performed his duties significantly less than he described, Dr. Cooper opined that it would not change his opinion regarding the causal connection between plaintiff's job duties and his condition.
18. Dr. Cooper also opined that plaintiff's job duties placed him at a greater risk of developing carpal tunnel syndrome as well as ulnar nerve entrapment at each elbow.
19. On July 11, 2007, plaintiff underwent a second Independent Medical Evaluation with Dr. Donald Getz. Dr. Getz opined that plaintiff's job duties were insufficiently repetitive to result in carpal tunnel syndrome. However, like Dr. Cooper, Dr. Getz could not state how many repetitions were necessary before a person would develop carpal tunnel syndrome and went on to testify that there is no "magic number." Further, based upon his examination, Dr. Getz opined that plaintiff did not suffer from carpal tunnel syndrome or cubital tunnel syndrome.
20. Because Dr. Armistead actually performed plaintiff's surgery and had an opportunity to view the condition of plaintiff's nerves first hand, his diagnosis of carpal tunnel and cubital tunnel syndromes is given greater weight than the opinions of Dr. Getz regarding whether or not plaintiff suffered from these conditions. As Dr. Getz's opinion regarding the causal connection between plaintiff's job and his conditions are colored by the opinion that the conditions did not exist, the Full Commission gives greater weight to the opinion of Dr. Cooper *Page 10 
in that regard.
21. The Full Commission finds persuasive the expert opinion of Dr. Cooper that the long-term repetition of motions, coupled with the greater than normal force required to accomplish his job duties, the amount of weights involved and the awkwardness of positions that plaintiff had to assume to perform his tasks were sufficient to result in the conditions from which plaintiff suffered.
22. The plaintiff suffers from an occupational disease of bilateral carpal tunnel and cubital tunnel syndromes that have resulted in his temporary total disability from employment beginning on August 26, 2005 and continuing, with the exception of approximately five to ten days when plaintiff attempted to return to work.
23. Following his termination from defendant-employer's job as a result of the defendant-employer's policy of termination, plaintiff underwent surgery for his right carpal tunnel condition and his right elbow condition. After recovering from those surgical procedures, plaintiff did not return to work, although he did apply for and receive unemployment compensation for a period of approximately 25 weeks at approximately $263.00 per week that ended in April, 2007. During the time plaintiff was eligible for unemployment compensation, he was unable to procure employment with the residual problems from the bilateral carpal tunnel and bilateral cubital tunnel syndromes along with the educational and vocational limitations that he has.
24. Although plaintiff has a high school diploma, he has difficulties reading and writing. His past work consisted of manual labor jobs including stints as a house painter, doing carpentry work, car detailer and oil changer. His physical condition is such that plaintiff cannot open a lid to a jar with either hand, cannot pick up a gallon of milk and cannot help his family *Page 11 
with cleaning his home. He continues to take Celebrex and Tramadol for pain and also takes Cymbalta and Elavil for depression and inability to sleep. There is little grip strength in his left hand and his right dominant hand cannot make a fist. There is coolness in the left elbow and cold weather makes it ache. Plaintiff can bend his elbows, but cannot bend the right one as much as the left and cannot press his elbows on a chair to get up because it is too tender.
25. Plaintiff's bilateral carpal tunnel and cubital tunnel syndromes were caused by the job duties he performed for defendant-employer in the course of his employment over a period of some 11 years. Further, his employment and the attendant tasks placed plaintiff at a greater risk than that of the general public of developing carpal tunnel and cubital tunnel syndromes.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an occupational disease arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-53(13).
2. As a result of the compensable occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $323.35 per week for the period of August 26, 2005 and continuing until further Order of the Full Commission, with the exception of those days on which plaintiff attempted to return to work in January 2006. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-2(19).
4. Defendants are entitled to a credit on a week by week basis for all weekly *Page 12 
payments of unemployment compensation paid to plaintiff. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission hereby enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability compensation to plaintiff at the rate of $323.35 per week for the period August 26, 2005 and continuing, with the exception of those days in which plaintiff attempted to return to work in January, 2006 and subject to credit on a week by week basis for any weekly unemployment benefits received by plaintiff. As much of said compensation as has accrued shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from the lump sum due plaintiff and paid directly to counsel. Thereafter, every fourth payment shall be made directly to plaintiff's counsel.
3. Defendants shall pay medical expenses incurred or to be incurred when medical bills have been submitted according to established North Carolina Industrial Commission procedures.
4. Defendants shall pay the costs.
This the __ day of August 2008.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER *Page 13 
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER